## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| AUDRA EDWARDS, DEREK EDWARDS, and BRIAN STONEBRAKER, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF FLORIDA, and THE UNIVERSITY ATHLETIC ASSOCIATION, INC.,<br><br>Defendants. | **Case No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff(s) Audra Edwards, Derek Edwards, and Brian Stonebraker ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against defendants the University of Florida, and The University Athletic Association, Inc. (collectively the "Team" or "Defendants"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

### <u>NATURE OF THE ACTION</u>

1. This is a class action brought on behalf of all persons who subscribed to www.floridagators.com (the "Team Website") operated by or based on Defendants' guidelines, coding, and content.

2. The Team Website provides users with access to video content related to the Team, including pre-recorded clips of games, interviews with players and team staff, sports analysts, and more.

3.      On the Team Website, Defendants offer the option for users to subscribe: (1) through ongoing e-newsletters; and (ii) through signing up for ticket purchasing accounts. Newsletter subscribers are given email updates regarding the Team and content on the Team Website in exchange for their contact information.  The newsletter email updates include links to the Team Website, which contains articles and videos.

4.      Defendants do not disclose on the Team Website that subscribers' personal identifying information ("PII") would be captured by the Facebook Pixel utilized by Defendants (referred to as the "Pixel," discussed and defined herein), and then transferred to Facebook thereby exposing the subscribers' PII to any person of ordinary technical skill who received that data.

5.      Data sharing policies for a service or subscription is an important factor for individuals deciding whether to provide personal information to that service.

6.      Congress has recognized the immediate and irreversible harm caused by associating a person's personally identifiable information in conjunction with their video watching.

7.      The Video Privacy Protection Act ("VPPA"), prohibits video tape service providers,[1] such as Defendants, from sharing PII tied to the title, description, or subject matter of pre-recorded audio video material[2] (the "Video Watching Data") without valid consent.[3]

8.      Congress made clear that the harm to individuals impacted by VPPA violations occurs the moment, and each time, a subscriber's information is shared.

9.      Defendants purposefully implemented and utilized the Pixel, which tracks user activity on the Team Website and discloses that information to Facebook to gather valuable

---

[1] 18 USC 2710(a)(4).
[2] 18 USC 2710(b)(2)(D)(II).
[3] 18 USC 2710.

marketing data.  The Pixel cannot be placed on a Team Website without steps taken directly by Defendants or on behalf of Defendants (*e.g.*, by a website manager).  The Pixel cannot be placed on the Team Website by Facebook without the knowledge and cooperation of Defendants.

10.     Defendants do not seek and have not obtained consent from users or subscribers to utilize the Pixel to track, share, and exchange their PII and Video Watching Data with Facebook.

11.     Defendants knew that their Pixel resulted in users' PII and Video Watching Data being shared (resulting in VPPA violations), and that they failed to obtain users' consent to allow their Pixel to operate in a way that shares users' protected information with Facebook.

12.     Subscribers of the Team Website have been harmed as a result of Defendants' violations of the VPPA.  In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendants to immediately (i) remove the Pixel from the Team Website, or (ii) add, and obtain, the appropriate consent from subscribers.

13.     Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons.  Plaintiffs seek relief in this action individually and on behalf of subscribers of the Team Website for violations of the VPPA, 18 U.S.C. 2710.

14.     Defendants violated the VPPA the moment, and each time, Plaintiffs and class members watched a video on the Team Website and had their PII shared.

**PARTIES**

15.     Plaintiff Audra Edwards is a resident of Florida.  In or around the year 2020, Ms. Edwards subscribed to Florida Gators' newsletters.  During the sign-up process, Ms. Edwards was not offered or asked for consent to share her information as a result of, or through, Defendants' Pixel.  Ms. Edwards watched pre-recorded video content on the Team Website using

a device that was signed into Facebook, as recently as February 2023, resulting in Ms. Edwards's PII and Video Watching Data being shared with Facebook.  Ms. Edwards recalls watching hype videos through the email newsletters she received, on the Team Website. Ms. Edwards's Facebook profile included personally identifiable information.  On February 21, 2023, Ms. Edwards served Defendants with pre-suit notice of the VPPA violations alleged herein.

16.     Plaintiff Derek Edwards is a resident of Florida.  In or around the year 2020, Mr. Edwards subscribed to Florida Gators' newsletters.  During the sign-up process, Mr. Edwards was not offered or asked for consent to share his information as a result of, or through, Defendants' Pixel.  Mr. Edwards watched pre-recorded video content on the Team Website using a device that was signed into Facebook, as recently as February 2023, resulting in Mr. Edwards's PII and Video Watching Data being shared with Facebook.

17.     Plaintiff Brian Stonebraker is a resident of Florida.  In or around the year 2013, Mr. Stonebraker subscribed to Florida Gators' newsletters.  During the sign-up process, Mr. Stonebraker was not offered or asked for consent to share his information as a result of, or through, Defendants' Pixel.  Mr. Stonebraker watched pre-recorded video content on the Team Website using a device that was signed into Facebook, as recently as February 2023, resulting in Mr. Stonebraker's PII and Video Watching Data being shared with Facebook. Mr. Stonebraker recalls watching games and news conferences on the Team Website.  Mr. Stonebraker's Facebook profile included personally identifiable information.

18.     Defendant University of Florida is a Florida public university and member of the State University System of Florida with its principal place of business in Gainesville, Florida. Defendant University of Florida operates and promotes an institution of higher learning and its associated collegiate sports teams, including through the development of websites and mobile apps.

19.     Defendant The University Athletic Association, Inc ("UAA") is a non-profit corporation headquartered in Gainesville, Florida. Defendant UAA administers the University of Florida's athletics programs and maintains the University of Florida Gators' ("Gators") sports programs.  The Gators offer guests of the site the option to sign-up for a team newsletter.  The Team Website also offers a selection of viewable media, including pre-recorded videos.  The Team Website has utilized Pixel that allows the Team to transmit subscribers' identifiable information, without the consent of subscriber-users, from the Team Website to Facebook.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from at least one Defendant.

21.     This Court has personal jurisdiction over Defendants because Defendants' principal place of business is in the state of Florida.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants' principal place of business is located in this District and Defendants conduct substantial business operations in this District. In connection with the Team Website, the video content, hosting of media accessible to subscribers, and associated coding, all originate and arise out of the Defendants' business operations in this District.

## COMMON FACTUAL ALLEGATIONS

**A.     Background of the Video Privacy Protection Act**

23.     The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements to obtain consumers' consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not

less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

24.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). The VPPA was initially passed in 1988 for the purpose of protecting the privacy of individuals' video rental, purchase and viewing data.

25.     In 1988, Senators were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audio-visual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

26.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

27.     During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that

"[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[4]

28.     Defendants here are video service providers in that they provided pre-recorded audio-visual materials to Plaintiffs and Class members on their Team Website (https://floridagators.com/).

29.     The relationship between Plaintiffs and Defendants is precisely the type of relationship contemplated by the VPPA.

30.     In this case, Defendants knowingly and systematically disclosed Plaintiffs' personal viewing information to Facebook, without obtaining their consent, by purposely placing the Pixel on the Team Website with the knowledge it would collect user information.

**B.    Defendants Utilize the Facebook Pixel to Gather and Transmit PII and Video Watching Data**

31.     Facebook offers the Facebook Pixel (the "Pixel") to web developers for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

32.     The Pixel is a marketing tool that must be added by website developers to a website.  A website must link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[5]  Thus, the addition of a Pixel to a website is an affirmative act

---

[4] See *Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited March 21, 2023).
[5]      *How to set up and install a Meta Pixel*, Facebook, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited March 21, 2023).

that must be done purposefully.  The Team went through, or directed its web site developers to go through, these steps to add the Pixel to its website.

33.     A function of the Pixel is to gather, collect and then share user information with Facebook.[6] This information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[7]

34.     Web developers and website operators can choose to use the Pixel to share both user activity and user identity with Facebook.

35.     The owner of a website – here, UAA and the Gators – holds the decision-making authority over the placement of the Pixel on its site.  The owner may not hand-select every detail associated with the website, ranging from the use of certain font, colors, etc. to the employment of tracking tool, such as the Pixel, or a keystroking monitor, or which and whether terms and conditions should be associated with its website, newsletter, or any other aspect of its business. The level of management or oversight by the owner, however, does not alter, reduce and certainly not eliminate its responsibility over the information displayed on its site, made available to visitors, or what is gathered about its user and then shared with third parties.

### a.     <u>Defendants added the Pixel to the Gators Website</u>

36.     To activate and employ  a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[8]  For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized

---

[6] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. (https://developers.facebook.com/docs/meta-pixel/).

[7] *See Meta Pixel*, FACEBOOK , https://www.facebook.com/business/tools/meta-pixel (last visited on March 6, 2023).

[8]     *How to create a Meta Pixel in Business Manager*, FACEBOOK, https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited March 21, 2023).

interface, (iii) access and manage by multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[9]

37.      The website operator must utilize the tools made available to it by Facebook in order to cause the Pixel to be created and added to its site.  The website operators name the Pixel.[10]

38.      Once the Pixel is created, the website operator will assign access to the Pixel to specific people for management purposes,[11] as well as connect the Pixel to a Facebook Ad account.[12]

39.      To add the Pixel to its website, the website operator can choose to add the Pixel code through the "event setup tool" via "partner integration" or by manually adding the code to the website.

40.      Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) creating the pixel; (ii) installing base code in the header of every webpage the Pixel is active, (iii) setting automatic advanced matching behavior, (iv) adding event code using an automated tool or manually,[13] (v) domain verification, and (vi) configuring web events.[14]

---

[9] Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (June 14, 2021), Sproutsocial, https://sproutsocial.com/insights/facebook-business-manager/ (last visited March 21, 2023).
[10] *Id.; see* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YouTube, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited March 21, 2023).
[11] *Add People to Your Meta Pixel in Your Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited March 21, 2023).
[12] *Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/622772416185967 (last visited March 21, 2023).
[13] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually.  *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YouTube, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited March 21, 2023).
[14] *How to set up and install a Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited March 21, 2023); *see* Ivan Mana, How to Set Up & Install the Facebook Pixel (in 2022), YouTube, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited March 20, 2023).

41.     After following these steps, a website operator can start harvesting information using the Pixel.

42.     A Pixel cannot be placed on a website by a third-party without being given access by the site's owner.  There are no known instances in which Facebook placed, or has been accused of placing, a Pixel on a website that it did not own.

43.     When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[15]

44.     A Facebook UID can be used, by anyone, to easily identify a Facebook user.  Any person, even without in-depth technical expertise, can utilize the UID. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

**b.      <u>The Pixel as a Tracking Method</u>**

45.     The Pixel tracks user-activity on web pages by monitoring events which,[16] when triggered, causes the Pixel to automatically send data directly to Facebook.[17]

---

[15] *Cookies & other storage technologies*, FACEBOOK, https://www.facebook.com/policy/cookies/ (last visited March 21, 2023).
[16]     *Meta      Business      Help      Center:      About      Meta      Pixel*,      FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited March 21, 2023).
[17]*See generally Id.*

46.     Examples of events utilized by websites are: a user loading a page with (i) "microdata" tags (the "Microdata event"),[18] or (ii) with a Pixel installed (the "PageView event").[19]  The Team Website utilizes both events.[20]

47.     When a PageView and/or Microdata event is triggered, a "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[21]  This confirms that the Pixel events sent data to Facebook.

48.     The HTTP Request includes a Request URL, embedded cookies such as the c_user cookie.  It may also include information in its Payload, such as metadata tags.

49.     A Request URL, in addition to a domain name and path, typically contains parameters.  Parameters are values added to a URL to transmit data and direct a web server to provide additional context-sensitive services, as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters[22]*

**c.      The Pixel Shares Users' PII and Video Watching Data**

50.     When a Pixel event triggers, the parameters included in a Request URL provide websites and Facebook with additional information about the event being triggered.[23]

---

[18] *Facebook Microdata Installing Schema*, CAT HOWELL https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited March 21, 2023).

[19] *Meta Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited March 21, 2023).

[20] The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool.  *See About the Meta Pixel Helper*, Facebook.com, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited March 21, 2023).

[21] *How We Built a Meta Pixel Inspector*, THE MARKUP https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited March 21, 2023).

[22] What is a URL?, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited March 21, 2023).

[23] *Meta for Developers: Conversion Tracking*, FACEBOOK  https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited March 21, 2023).

51.     The parameters for a Request URL, for instance, may include the title of a video being watched or the URL of the video, as depicted below:



*Figure 2 - PageView event firing, including video title and URL of video as parameters of Request URL[24]*

52.     While Microdata events can send data through the parameters, often the Microdata event sends its information through the Payload.

53.     Microdata events are triggered whenever a web page containing Microdata tags is loaded.[25]

54.     Microdata tags allow developers to nest metadata within the contents of a web page.[26]

55.     This metadata may include the title of a video – for example, here, "title": "Todd Golden Postgame 2-15-23 – Florida Gators" – on the Team's website, as depicted below:

---

[24]     *VIDEO:  Coach  Butler  Recaps  Comeback  Season*, FLORIDA  GATORS
https://floridagators.com/news/2016/3/21/womens-basketball-video-coach-butler-recaps-comeback-season     (last
visited March 21, 2023).
[25] *Facebook Microdata Installing Schema*, CAT HOWELL  https://cathowell.com/facebook-microdata-what-it-is-
how-to-set-it-up/ (last visited March 21, 2023).
[26]     *Meta  for  Developers:  Microdata  Tags*, FACEBOOK    https://developers.facebook.com/docs/marketing-
api/catalog/guides/microdata-tags/ (last visited March 21, 2023).



*Figure 3 - Microdata Event sends Microdata tag for video's title to Facebook.[27]*

56.     When a Microdata event fires, it sends a request to Facebook containing data, including, but not limited to, the Microdata tags, as depicted in the developer's console viewing the "Payload" above.

57.     When a "c_user" cookie is in place, both the Microdata and PageView event requests include a user's c_user cookie and copy the c_user cookie into the Request Header, as depicted below:

---

[27]     *Todd        Golden        Postgame        2-15-23*,   FLORIDA        GATORS
https://floridagators.com/showcase/embed.aspx?Archive=22417&youtube=&autoplay=tru&controls=true&title=
(last visited March 21, 2023).

*Figure 4 - Embedded c_user cookie in Pixel Request transmitted to Facebook*

58.     Both the Microdata and PageView events, when triggered, independently and automatically result in the sharing of a user's website interactions (including Video Watching Data) and Facebook UID with Facebook.

59.     Thus PII and Video Watching Data of subscriber-users, including Plaintiffs and Class Members, have automatically been shared with Facebook as a result of Team's decision to add the Pixel to the Team Website.

**C**.    **E-Newsletters and E-Subscriptions, Even When Free to Users, Are a Value Exchange Between the Gators and Subscribers**

60.     The Gators benefits from the value created through its use of free e-newsletters and its subscription-based service model.

61.     E-newsletters are an important and effective business tool.  In fact, 31% of business-to-business marketers say that sending e-newsletters is the paramount way to nurture leads.[28] Additionally, visitors who reach web pages through e-mails, such as e-newsletters, view more pages per session (2.5 to 1.2), as well as visiting web pages more often than those referred

---

[28] *What is an Email Newsletter?*, CAMPAIGN MONITOR https://www.campaignmonitor.com/resources/knowledge-base/what-is-an-email-newsletter/ (last visited March 21, 2023).

to web pages from Facebook.[29]  Web page visits stemming from e-mails are also more engaged than those from any other platform.[30]  The Gators, through its interplay between its free newsletters and increasing traffic to its website, recognized and utilized this business tool.

62.     E-newsletters further provide value by creating brand awareness and broaden interest in the organization itself.[31]  The Gators' newsletter effectively served to provide this value.

**D**.      **Sign-up for the Defendants' Subscriptions Lack Informed, Written Consent**

63.     The Team Website does not seek nor obtain permission from their subscribers, including Plaintiffs and the Class, to share the subscribers' PII or Video Watching Data with third-parties, including Facebook.

64.     The sign-up processes for the Team Website's newsletters do not seek nor obtain informed, written consent.

65.     To the extent information about any of the Team Website's data sharing can be located, the language (i) is not presented to users of the site in a transparent manner; (ii) is not made available as part of the sign-up process; (iii) is not offered to users as checkbox or e-signature field, or as any form of consent; and (iv) does not include terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party.

66.     The team website includes a newsletter sign-up, which appears as: [32]

---

[29] *Content Monetization: Driving Revenue with Email Newsletters*, UPLAND https://uplandsoftware.com/postup/resources/blog/content-monetization-email-newsletters/ (last visited March 21, 2023).

[30] *Id.*

[31] *8 Ways to Monetize Email Newsletters for Publishers*, SAILTHRU https://www.sailthru.com/marketing-blog/8-ways-monetize-email-newsletters-publishers/ (last visited March 21, 2023) (adding that e-newsletters can serve as a means to hook consumers to more frequently subscribe to a paid subscriptions with the company by providing users a taste of what the sites' paid content may offer).

[32] *Email Signup*, FLORIDA GATORS, https://floridagators.com/sports/2017/8/15/email-signup.aspx?id=13853 (last visited March 21, 2023).



**E.   <u>Plaintiffs Did Not Consent to Defendants' sharing of Plaintiffs' PII and Video Watching Data</u>**

67.    The VPPA sets out guidelines as to the forms of consent that consumers can give to video tape service providers to share consumers' information.

68.    The VPPA limits video tape service providers' ability to share consumers' PII with third-parties, except where consumers provide "informed, written consent (including through an electronic means using the Internet) . . . in a form that is distinct and separate from any form setting forth other legal or financial obligations of the consumers."[33]

69.    Such consent must be at the election of consumers, and consumers must be clearly and conspicuously provided with an opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.[34]

70.    While limited information regarding consumers can be shared (e.g., name and address) to third parties, this exemption only applies where video tape service providers give the

---

[33] 18 USC 2710(b)(2)(B); 18 USC 2710(b)(2)(B)(i).
[34] 18 USC 2710(b)(2)(B)(ii); 18 USC 2710(b)(2)(B)(iii).

consumer a clear and conspicuous opportunity to prohibit this disclosure and the disclosure does not identify the title, description, or subject matter of the audio-visual material.[35]

71.     Plaintiffs and Class Members did not consent to Defendants' Pixel pursuant to the VPPA, as Plaintiffs were not asked to provide informed, written consent in a form separate from other legal or financial obligations.

72.     Additionally, Plaintiffs and Class Members are not given the opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.

73.     Finally, Defendants provide titles, descriptions, or subject matter of audio-visual materials when sharing Plaintiffs' and Class Members' PII.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this action individually and on behalf of the following Class:

> All persons in the United States with a subscription to the Gators' website that had their personal information improperly disclosed to Facebook through the use of the Pixel (the "Class").

75.     Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

76.     Plaintiffs reserve the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

---

[35] 18 USC 2710(b)(2)(D).

77.     This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

78.     Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Defendants' Team Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

79.     Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, subscribed to, and used, a Team Website to watch videos, and had their PII collected and disclosed by Defendants.

80.     Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class.   Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

81.     Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class members is relatively small, the expense and burden of individual litigation make it impossible for individual Class members to seek redress for the wrongful conduct asserted herein.  If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

82.     Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and

fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

   a.   Whether Defendants collected Plaintiffs' and the Class's PII and Video Watching Data;

   b.   Whether Defendants unlawfully disclosed and continues to disclose the PII and Video Watching Data of subscribers of the Team Website in violation of the VPPA;

   c.   Whether Defendants' disclosures were committed knowingly; and

   d.   Whether Defendants disclosed Plaintiffs' and the Class's PII and Video Watching Data without consent.

83.   Information concerning Defendants' Team Website data sharing practices and subscription members are available from Defendants' or third-party records.

84.   Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

85.   The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Defendants.  Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

86.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

87.   Given that Defendants' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

**COUNT I**

**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

88.　　Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

89.　　Plaintiffs bring this count on behalf of themselves and all members of the Class.

90.　　The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

91.　　Defendants violated this statute by knowingly disclosing Plaintiffs' and other Class members' personally identifiable information to Facebook.

92.　　Defendants, through the Team Website, engages in the business of delivering video content to subscribers, including Plaintiffs and the other Class members, and other users. The Team Website delivers videos to subscribers, including Plaintiffs and the other Class members, by making those materials electronically available to Plaintiffs and the other Class members on the Team Website.

93.　　"Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

94.　　A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

95.     Defendants are "video tape service providers" because they create, host, and deliver hundreds of videos on its websites, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

96.     Defendants also solicit individuals to subscribe to the Team newsletters that advertise and promote videos and articles on the Team Website.

97.     Plaintiffs and members of the Class are "consumers" because they subscribed to the Team newsletters. 18 U.S.C. § 2710(a)(1).

98.     Plaintiffs and the Class members viewed video clips using the Team Website.

99.     Defendants disclosed to Facebook Plaintiffs' and the Class members' personally identifiable information. Defendants utilized the Pixel which forced Plaintiffs' web browser to transfer Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs' event data, like the title of the videos they viewed.

100.    Defendants knowingly disclosed Plaintiffs' PII, which is triggered automatically through Defendants' use of the Pixel.  No additional steps on the part of the Defendants, Facebook or any third-party is required.  And, once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

101.    The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed

written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

102.    Plaintiffs and Class members did not provide Defendants with any form of consent — either written or otherwise — to disclose their PII to third parties.  Defendants failed to obtain "informed, written consent" from subscribers – including Plaintiffs and Class members – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

103.    Defendants' disclosure of Plaintiffs' and Class Members' Video Watching Data and PII was not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendants' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

104.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendants failed to provide an opportunity to opt out as required by the VPPA.

105.    On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a)     For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b)     For an order declaring that the Defendants' conduct violates the statute referenced herein;

(c)     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)     Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendants to immediately (i) remove the Pixel from the Team Website or (ii) add, and obtain, the appropriate consent from subscribers;

(e)     For damages in amounts to be determined by the Court and/or jury;

(f)     An award of statutory damages or penalties to the extent available;

(g)     For Defendants to pay $2,500.00 to Plaintiffs and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h)     For pre-judgment interest on all amounts awarded;

(i)     For an order of restitution and all other forms of monetary relief;

(j)     An award of all reasonable attorneys' fees and costs and

(k)     Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: March 23, 2023 **STEINLAW FLORIDA, PLLC**

By: /s/ Jonathan M. Stein
Jonathan M. Stein (Fla. Bar No. 9784)
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Telephone: (561) 299-1509
Email: jon@SteinLawFlorida.com

Mark S. Reich*
Courtney Maccarone*
Gary I. Ishimoto*
**LEVI & KORSINSKY, LLP**
55 Broadway, 4th Floor, Suite 427
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com
Email: gishimoto@zlk.com

*Counsel for Plaintiffs*

*pro hac vice* forthcoming