IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

AUDRA EDWARDS, DEREK
EDWARDS, and BRIAN
STONEBAKER, on behalf of themselves
and all others similarly situated,

      Plaintiffs,

v.                                      **Case No. 1:23-cv-65-AW-MAF**

LEARFIELD COMMUNICATIONS,
LLC, SIDEARM SPORTS, LLC, et al.,

      Defendants.

_____/

## ORDER GRANTING MOTIONS TO DISMISS

Working with the University of Florida's Athletic Association, Learfield Communications and Sidearm Sports developed the official website for everything Gators athletics. Fans can use the website—floridagators.com—to buy tickets, shop for gear, or watch videos with player interviews, sports highlights, and the like. Plaintiffs Audra Edwards, Derek Edwards, and Brian Stonebaker signed up for the website's free email newsletter. But they claim they got more than they signed up for: they allege that when they click links in the newsletter, the website sends their personal information to third parties.

Plaintiffs sued the University of Florida, The University Athletic Association, Learfield, and Sidearm under the Video Privacy Protection Act, 18 U.S.C. § 2710. That law generally precludes video providers from knowingly disclosing personally

identifiable information about a consumer's video-watching habits. *Id.* Plaintiffs seek damages and injunctive relief. ECF No. 4 (First Amended Complaint (FAC)).

The UAA and UF Board of Trustees (Plaintiffs did not name the Board as a defendant) moved to dismiss based on Eleventh Amendment immunity and failure to state a claim. ECF No. 22. Learfield and Sidearm moved to dismiss on similar grounds and also advanced an indispensable-party argument. ECF No. 24. (For simplicity, this order refers to Learfield and Sidearm collectively as "Learfield," *see id.* at 8.[1]) Plaintiffs responded to both motions, ECF Nos. 32, 41, and the parties filed several notices of supplemental authority and responses. ECF Nos. 29-31, 35, 37, 39-46.

The UAA and Trustees requested oral argument. ECF No. 22 at 34. Plaintiffs and Learfield did not. In my discretion, I conclude that oral argument is unnecessary. Having considered the parties' written arguments, I now grant both motions.

## I.

Learfield is a marketing company that creates and manages websites for college athletic programs.[2] FAC ¶¶ 33-44. It manages floridagators.com, the website for Florida Gators athletics, *id.* ¶ 54, which I will call the "Gators Website."

---

[1] All page citations are to the CM/ECF generated numbers.

[2] The facts come mostly come from the complaint, and at this stage I must accept them as true. *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1238 (11th Cir. 2023). But I note that the complaint cites many websites, including the Gators

As noted above, fans can visit the Gators Website to watch free video content. They can also sign up for free "Florida Gator Email Updates." https://www.floridagators.com/sports/2015/12/10/_updates_.aspx (last accessed October 5, 2023). Clicking "Subscribe Now" directs visitors to the "Email Signup" page. *Id.*; FAC ¶ 101. That page asks for a fan's name, email address, zip code, and the type of content sought. FAC ¶ 101; https://www.floridagators.com/sports/2017/8/15/email-signup.aspx?id=13853 (last accessed October 5, 2023). Those who sign up receive emails that "include links to the Team Website, which contains [the] articles and videos." FAC ¶ 3.

Learfield installed Facebook's "Pixel" software on the Gators Website. *Id.* ¶¶ 55-58; 80-94. The pixel enables Facebook to track its users' activity on other websites. *Id.* When a user logs into Facebook, Facebook generates a "c_user" cookie and stores it on the user's device. *Id.* ¶ 78. That cookie "contains a user's non-encrypted Facebook User ID number ('UID')." *Id.*[3] Then, if that user interacts with

---

Website itself. Because these webpages are "referred to in the complaint, central to the plaintiff's claim[s], and of undisputed authenticity," I may also consider them without converting Defendants' motions into summary-judgment motions. *See Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020)).

[3] According to a Facebook page cited in the First Amended Complaint (ECF No. 4 at 27 n.48), "[c]ookies are small pieces of text used to store information on web browsers. Cookies are used to store and receive identifiers and other information on computers, phones and other devices." https://www.facebook.com/policy/cookies/ (last visited October 5, 2023).

the Gators Website, the site sends Facebook metadata that "may" include a video title and a c_user cookie if one is in place on the user's device. *Id.* ¶¶ 82-92. If someone can access the metadata and find the c_user ID, he can append the c_user ID to a URL (www.facebook.com/[UID here]) to reach the corresponding Facebook profile. *Id.* ¶ 79.

Plaintiffs are Facebook users who signed up for the Gators Website's email updates. *Id.* ¶¶ 15-17. After receiving email updates, they all used devices logged into Facebook to watch videos on the website. *Id.* ¶¶ 15-17. And they never gave written consent to having any video-watching data shared with Facebook. *Id.* ¶¶ 98-101.

## II.

Turning now to Defendants' arguments, I note at the outset that Plaintiffs improperly named UF as a defendant. Pursuant to state law, UF itself lacks the capacity to be sued. *See* Fed. R. Civ. P. 17(b); Fla. Stat. § 1001.72(1); *see also Paylan v. Teitelbaum*, 2017 WL 2294084, at *2 (N.D. Fla. May 23, 2017) ("[UF's Board of Trustees] is the proper entity to be sued in cases against the University of Florida."), *report and recommendation adopted*, 2017 WL 2294083 (N.D. Fla. May 25, 2017). (The motion to dismiss presented this argument, ECF No. 22 at 1 n.1, and Plaintiffs offered nothing in response.) I will dismiss the claims against UF itself on this basis. But I would dismiss those claims anyway because UF is entitled to

Eleventh Amendment immunity for the same reasons UAA is. I address those reasons next.

## A.

"The law is well-settled that Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an arm of the state is sued." *Myrick v. Fulton Cnty., Georgia*, 69 F.4th 1277, 1294 (11th Cir. 2023) (cleaned up) (quoting *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc)). "An assertion of Eleventh Amendment immunity essentially challenges a court's subject matter jurisdiction." *Id.* (quoting *Seaborn v. Fla. Dep't of Corr.*, 143 F.3d 1405, 1407 (11th Cir. 1998)). This issue is therefore a logical starting point.

> *i.    The UAA is entitled to Eleventh Amendment immunity.*

UAA claims it is an arm of the state, ECF No. 22 at 6-13, 15-18, and Plaintiffs do not meaningfully argue otherwise. Indeed, Plaintiffs essentially concede the Eleventh Amendment's general applicability here, proceeding directly to their argument that the *Ex parte Young* exception applies. *See* ECF No. 32 at 28-35. Nonetheless, I will briefly analyze the arm-of-the-state issue.

To determine whether an entity is an arm of the state, a court must first consider "the particular function in which [it] was engaged" during its challenged conduct. *Lake v. Shelton*, 840 F.3d 1334, 1337-38 (11th Cir. 2016) (quoting *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc)). It then determines whether

the defendant acted as an arm of the state in performing that function. *Id.* Four factors guide that inquiry: (1) how state law defines the entity, (2) the state's degree of control over it, (3) the source of its funding, and (4) the party responsible for judgments against UAA. *See id.* (citing *Manders*).

Applying these factors, I conclude the UAA is an arm of the state.[4] As the UAA points out, Florida law defines it as a direct support organization (DSO). ECF No. 22 at 8-10. DSOs like UAA are not "autonomous and self-sufficient entit[ies]" but instead operate under "substantial state 'constraints over . . . day-to-day operations." *Plancher v. UCF Athletics Ass'n, Inc.*, 175 So. 3d 724, 729 (Fla. 2015) (citations omitted) (reasoning that UCF's athletic association, materially identical to the UAA here, had sovereign immunity); *see also* Fla. Admin. Code R. 6C1-1.300 (providing that UAA employees are also considered employed by UF's Board of Trustees, that UAA must submit a budget to UF's president, that UAA must report any significant changes in spending to the president, and that the president can decertify UAA as a DSO if it stops "serving the best interest of the University").

---

[4] UAA cited evidence supporting each factor, including UAA bylaws, articles of incorporation, and financial information. Plaintiffs have not objected to my consideration of that evidence, offered no contradictory evidence, and did not request an evidentiary hearing. Indeed, their response did not even dispute the legal conclusion that UAA is an arm of the state. At any rate, I may consider the evidence to determine sovereign immunity. *See Papasan v. Allain*, 478 U.S. 265, 302 n.1 (1986) (considering matters outside the complaint in addressing the Eleventh Amendment on a motion to dismiss when the facts were not disputed).

As an arm of the state, UAA is entitled to Eleventh Amendment immunity. Plaintiffs do not argue that Congress has abrogated the UAA's immunity or that Florida has waived it.[5] *See* ECF No. 32 at 28-35. Instead, Plaintiffs argue that they can seek injunctive relief against the UAA under *Ex parte Young*. *Id.* But that exception applies only when plaintiffs seek injunctive relief against state *officers*. *Ex Parte Young*, 209 U.S. 123, 168 (1908). *Ex parte Young*'s narrow exception to immunity "has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *P. R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (citation omitted).

ii.     *Learfield has not shown it is entitled to Eleventh Amendment immunity.*

Learfield also invokes Eleventh Amendment immunity, ECF No. 24 at 11-14, but unlike the UAA, they have not shown entitlement to immunity—at least not at this stage. They base their argument on Fla. Stat. § 768.28(9)(a), which provides state law immunity to state agents and employees:

> An officer, employee, or agent of the state or of any of its subdivisions may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or

---

[5] These would be difficult arguments. Nothing in the VPPA shows an "unmistakably clear" congressional intent to abrogate. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 143 S. Ct. 1689, 1695 (2023) (quoting *Fin. Oversight & Mgmt. Bd. for P.R. v. Centro De Periodismo Investigativo, Inc.*, 143 S. Ct. 1176, 1183 (2023)). And Florida Statute § 768.28—which waives Florida's sovereign immunity in limited instances—does not waive Eleventh Amendment immunity here. *See* Fla. Stat. § 768.28(18).

7

> function, unless such officer, employee, or agent acted in bad faith or
> with malicious purpose or in a manner exhibiting wanton and willful
> disregard of human rights, safety, or property.

In Learfield's view, they are the UAA's agent and thus enjoy the same immunity.
But § 768.28(9)(a) cannot immunize defendants from liability *under federal law*.
*See Howlett By & Through Howlett v. Rose*, 496 U.S. 356, 375 (1990) ("The
elements of, and the defenses to, a federal cause of action are defined by federal
law." (citing cases in accord)); *see also Hufford v. Rodgers*, 912 F.2d 1338, 1341 n.1
(11th Cir. 1990) ("[W]hen parties raise federal claims (at least, under Section 1983),
then federal law must determine whether particular governmental entities are subject
to suit" (citing *Howlett*, 496 U.S. at 377)).

Thus, Learfield's entitlement to Eleventh Amendment immunity turns on the
same four-factor analysis applicable to the UAA. *See Lake v. Shelton*, 840 F.3d 1334,
1337-38 (11th Cir. 2016) (quoting *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir.
2003) (en banc)). And Learfield has not shown at this stage that it is immune from a
VPPA claim.

To the extent Learfield contends § 768.28(9)(a) shows that an agent is an arm
of the state, it is unlikely that corporations would even qualify as agents under the
statute. *See Lovelace v. G4S Secure Sols. (USA), Inc.*, 320 So. 3d 178, 189-90 (Fla.
4th DCA 2021) (suggesting that § 768.28(9)(a)'s application is limited to
individuals, not corporations: "subsection (9) states that those individuals may not

8

be 'personally liable.' . . . . The United States Supreme Court has found that the ordinary usage of the word 'personal' refers to individuals, not corporations."). But more importantly, the degree of control the state retained here is minimal. The complaint alleges that Learfield managed the website and mobile platforms, providing set up and operation services, data storage, video-hosting, and technical backend and support services. These allegations—which I must accept as true at this stage—show Learfield retained significant control. FAC ¶¶ 45-46, 49-54.

While Learfield says that any damages award against them would require "money to be paid jointly by the state and Learfield," it does not explain why that would be. ECF No. 24 at 13-14. And Learfield makes no argument as to the third factor of the analysis, source of funding. In short, Learfield has not shown entitlement to Eleventh Amendment immunity.

**B.**

Learfield next argues that the UF Defendants are indispensable parties that cannot be joined and that I therefore must dismiss. ECF No. 24 at 14-17. Rule 12(b)(7) allows dismissal for failure to join a required party under Rule 19. Rule 19 mandates joinder of required parties and, if a required party is absent, "the court must determine whether the lawsuit can proceed without the party 'in equity and good conscience.'" *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1347 (11th Cir. 2011) (quoting Fed. R. Civ. P. 19(b)). The party asserting mandatory

joinder bears the burden of showing it. *Id.* (citing *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1280 (11th Cir. 2003)).

Learfield offers two reasons why the UF Defendants are indispensable, but neither is persuasive. Learfield first argues that the UF defendants are necessary "because Plaintiffs' claims concern allegedly concerted conduct" by all Defendants—thus inhibiting the court from "accord[ing] complete relief" and subjecting Learfield to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." *See* ECF No. 24 at 15; Fed. R. Civ. P. 19(a)(1)(A)(i); *id.* (a)(1)(B)(ii). But that will not work. "It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990).

Learfield next argues that allowing the action to proceed without the UF Defendants risks impairing their interests in the website. *Id.* at 15-16. That is not persuasive either. Plaintiffs challenge the Gators Website's use of Facebook's pixel. Learfield does not explain how or why UF has an interest in the continued use of pixel, or any interest in the data it collects. Nor does Learfield explain how a judgment against it would undermine UF's interest in anything. This is unlike the cases Learfied cites, in which the property of a nonparty could be impacted. *See Lee v. Anthony Lawrence Collection*, *LLC*, 47 F.4th 262, 269 (5th Cir. 2022), cert. denied, 143 S. Ct. 1054 (2023) (involving another party's "battle of ownership" of a

trademark); *Fla. Wildlife Fed'n Inc. v. United States Army Corps of Engineers*, 859 F.3d 1306, 1309 (11th Cir. 2017) (involving another party's right to control "the waters at the center of th[e] controversy"). UF does not purport to have ownership interest or control over the pixel or the data it collects.

In short, Learfield has not shown that the court should dismiss based on the unavailability of any indispensable party.

## C.

At last, the merits. Learfield argues that Plaintiffs have failed to state a claim upon which relief can be granted. ECF No. 24 at 17. To survive this challenge, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Threadbare conclusory statements are insufficient. *Id.* at 678-79. A claim is facially plausible if, construing the facts in the light most favorable to plaintiffs, the facts allow a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

Learfield argues that Plaintiffs' claims fail because (1) Plaintiffs are not "consumer[s]" protected by the VPPA, (2) Learfield and Sidearm are not "video tape service provider[s]," and (3) Plaintiffs do not allege a knowing disclosure of

"personally identifiable information." *See* ECF No. 24 at 2. Learfield separately argues that the VPPA unconstitutionally restricts free speech. *Id.* at 29-36.

Learfield is correct that the complaint fails to state a VPPA claim for reasons (1) and (3). I am skeptical of Learfield's argument as to (2), but I need not resolve the issue.[6] And I likewise do not reach the constitutional arguments. *Cf. Camreta v. Greene,* 563 U.S. 692, 705 (2011) (noting a "longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them") (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 445 (1988)).

> i.   *Plaintiffs have not alleged that they are consumers.*

The VPPA prohibits "video tape service provider[s]" from knowingly disclosing "personally identifiable information concerning any consumer" to third parties, subject to certain exceptions. 18 U.S.C. § 2710(b). As relevant here, the law defines "consumer" as "any renter, purchaser or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). Because the email updates are free, Plaintiffs are not renters or purchasers. Indeed, they do not claim otherwise, arguing

---

[6] "[V]ideo tape service provider[s]" are persons "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Plaintiffs' allegations appear to support the conclusion that Learfield is engaged in the business of delivering audio visual materials through its websites. *See* FAC ¶¶ 18-19, 36-44, 47.

only that they are "subscriber[s]" to the Gators Website's email updates. FAC ¶¶ 15-17; ECF No. 41 at 16-22.

The VPPA does not define "subscriber." The Eleventh Circuit interpreted "subscription" in *Ellis v. Cartoon Network, Inc.* to "involve[] some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." 803 F.3d 1251, 1256 (11th Cir. 2015). Factors that may show a subscription include "payment, registration, commitment, delivery, expressed association, and[] access to restricted content." *Id.* (cleaned up) (quoting *Yershov v. Gannett Satellite Info. Network, Inc.*, 104 F. Supp. 3d 135, 147 (D. Mass. 2015), *rev'd*, 820 F.3d 482 (1st Cir. 2016)); *see also Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015) ("Whatever the nature of the specific exchange, what remains is the subscriber's deliberate and durable affiliation with the provider . . . ."); *Ellis*, 803 F.3d at 1257-58 ("agree[ing] with the approach and result of *Austin-Spearman*").

Applying this framework in *Ellis*, the Eleventh Circuit held that "downloading an app for free and using it to view [video] content at no cost is not enough to make a user of the app a 'subscriber.'" 803 F.3d at 1257. It emphasized that the act involved no durable commitment at all; the "user [was] free to delete the app without consequences whenever he like[d], and never access its content again." *Id.* That made downloading the app "the equivalent of adding a particular website to one's

13

Internet browser as a favorite, allowing quicker access to the website's content." *Id.*; *see also Perry v. Cable News Network*, 854 F.3d 1336, 1341-44 (11th Cir. 2017) (affirming dismissal of an identical claim for the same reasons).

Just as downloading a free app did not create a subscription in *Ellis* and *Perry*, Plaintiffs' signing up for email updates here did not make them "subscribers." Signing up requires no "durable" commitment or real exchange at all. *Austin-Spearman*, 98 F. Supp. 3d at 669. Plaintiffs do not allege that signing up "establish[es] an account [on]" floridagators.com. *Ellis*, 803 F.3d at 1257; *see also Perry*, 854 F.3d at 1342 (quoting *Ellis*). And although the fact that the emails were free is not a dispositive factor, it is still a factor. *Ellis*, 803 F.3d at 1256; *Perry*, 854 F.3d at 1342. Here, it further supports the conclusion that Plaintiffs can opt out or ignore the newsletter "without consequences whenever [they] like, and never access its content again." *Ellis*, 803 F.3d at 1257.

Significantly, Plaintiffs do not allege that those who sign up for the emails get any real benefit in exchange. Signing up does not grant access to any exclusive or restricted content, much less any exclusive video content. *Cf. Ellis*, 803 F.3d at 1257; *Perry*, 854 F.3d at 1342; *see also* ECF No. 41. The newsletters linked to videos on the Gators Website itself, where Plaintiffs watched them. FAC ¶¶ 3, 15-17. Anyone can watch from the Gators Website, regardless of whether they signed up for the newsletter. That makes the newsletter "the equivalent of adding a particular website

to one's Internet browser as a favorite, allowing quicker access to the [Gators] website's content." *Ellis*, 803 F.3d at 1256. In other words, based on the facts Plaintiffs have alleged, the newsletter simply notifies readers about Gators Website content—content available to anyone.[7]

It is true that Plaintiffs conveyed minimal personal information—their name, email, and zip code—in signing up for the emails. *Ellis*, 803 F.3d at 1256. But that is only one factor suggesting a subscription may exist. *Id.* (reasoning subscriptions "involve some or [most] of the . . . factors" (first alteration in original, quoting *Yershov*, 104 F. Supp. 3d at 147)). And considering this in context of the other factors—the newsletters are free, are cancellable without consequences, and provide no exclusive benefits—one cannot conclude it plausible that Plaintiffs are "subscribers" for VPPA purposes. *See Gardener v. MeTV*, 2023 WL 4365901, at *5 (N.D. Ill. July 6, 2023) (reasoning that "only one factor [wa]s met . . . : registration," where plaintiff used name and email to sign up for newsletter, but "this one factor alone seem[ed] insufficient"); *Carter v. Scripps Networks, LLC*, --- F. Supp. 3d ----, 2023 WL 3061858, at *6 (S.D.N.Y. Apr. 24, 2023) ("The newsletters may entice

---

[7] Learfield also argues that Plaintiffs are not "subscriber[s] of goods or services" because "goods or services" only encompasses *audio-visual* goods or services, not emailed newsletters. ECF No. 24 at 19-20. That is perhaps correct, but I do not decide the issue. Either way, though, the newsletter does not grant access to exclusive video content, and that is a relevant factor. *See Ellis*, 803 F.3d at 1257; *Perry*, 854 F.3d at 1342.

or encourage recipients to view hgtv.com videos, but there is no assertion that a newsletter subscription was required to access those videos, functioned as a login, or gave newsletter subscribers extra benefits as viewers."); *Salazar v. Nat'l Basketball Ass'n*, 2023 WL 5016968, at *9-10 (S.D.N.Y. Aug. 7, 2023) (similar); *Alex v. NFL Enters. LLC, et al.,* 2023 WL 6294260 (S.D.N.Y. Sep. 27, 2023) (similar); *cf. Austin-Spearman*, 98 F. Supp. 3d at 671-72 (granting leave to amend to add details about a newsletter, but "do[ing] so with great reluctance" and "remain[ing] skeptical" that the amendment would state a claim).

Because Plaintiffs have not alleged facts plausibly showing they are "consumers," under the VPPA, their claim must be dismissed.

> ii.   *Plaintiffs do not allege the Gators Website discloses "personally identifiable information."*

The VPPA claim fails for a separate, independent reason: Plaintiffs have not alleged any disclosure of personally identifiable information.[8] As already noted, the VPPA only prohibits disclosing "personally identifiable information" (PII). 18 U.S.C. § 2710(b)(1). That term "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3).

---

[8] I reach this conclusion without resolving Learfield's arguments that Plaintiffs' own browsers disclosed their data and that Plaintiffs do not plausibly allege knowledge. *See* ECF No. 24 at 26-29.

No binding authority interprets that definition. The First Circuit has held PII must be "reasonably and foreseeably likely to reveal which . . . videos [a specific person] has obtained." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). It cautioned that, at some point, "the linkage of information to identity [can] become[] too uncertain, . . . too dependent on too much yet-to-be-done, or unforeseeable detective work" to allow a plausible VPPA claim. *Id.* at 486. The Third and Ninth Circuits have adopted a narrower test, asking whether the information at issue "would readily permit an ordinary person to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 267 (3d Cir. 2016); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017); *see also In re Nickelodeon*, 827 F.3d at 284 (citing Congress's "quite narrow" purpose in enacting the VPPA—preventing disclosures that would identify the recipient to identify a person's video-watching habits "with little or no extra effort").

Plaintiffs' claim would fail under either test. And under any reasonable interpretation of the statute, Plaintiffs have not alleged enough. At best, they plausibly allege that *sometimes* Facebook can use a UID to identify a particular person. They do not allege that Facebook ever used, or even can use, *their* UIDs to identify *them* or *their* video-watching habits. The complaint does not even allege that each Plaintiff was signed into his or her own Facebook account when visiting

the Gators Website; it says only that each Plaintiff "us[ed] a device that was signed into Facebook." FAC ¶¶ 15-17.

Even assuming Plaintiffs were signed into their own Facebook accounts, the complaint "contains no allegation as to what information was actually included on [their] profile[s]," such as their names or birthdays. *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 92 (S.D.N.Y. 2022). It offers only threadbare recitals that Ms. Edwards's and Mr. Stonebraker's "profile[s] included personally identifiable information." FAC ¶¶ 15, 17 (The complaint omits even any threadbare recital as to Mr. Edwards, *id.* ¶ 16.). That "formulaic recitation of the element[]" is not enough. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555).

Perhaps more significantly, the complaint does not allege facts plausibly showing that the Gators Website's pixel "readily permit[s] *an ordinary person* to identify" Plaintiffs' video-watching behavior, *In re Nickelodeon*, 827 F.3d at 267 (emphasis added), or how Facebook can do that without "unforeseeable detective work," *Yershov*, 820 F.3d at 486. Although Plaintiffs do allege that the Gators Website transmits metadata, which contains c_user IDs and "may" contain video titles, FAC ¶¶ 82-92, they offer no facts explaining how Facebook accesses that metadata, why doing so does not require technical expertise, or how much metadata Facebook has to comb through to discover someone's c_user ID and the video titles. The complaint only alleges in conclusory fashion that "[o]nce the Pixel's routine

exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user." *Id.* ¶ 79.

* * *

To summarize, the complaint does not plausibly allege that Plaintiffs are "consumer[s]" under the VPPA or that the Gators Website has disclosed (or will disclose) any of their own PII to any third party. For each of those independent reasons, Plaintiff's First Amended Complaint fails to state a VPPA claim.

Although it appears unlikely that Plaintiffs will be able to add additional facts that state a plausible VPPA claim, *see Austin-Spearman*, 98 F. Supp. 3d at 671-72, the dismissal will be with leave to amend.

CONCLUSION

Defendants' motions to dismiss (ECF Nos. 22, 24) are GRANTED. The first amended complaint (ECF No. 4) is DISMISSED. UF is dismissed from this action as an improperly named party, and Plaintiffs' claim against the UAA is dismissed without prejudice based on Eleventh Amendment immunity.

Plaintiffs' VPPA claim against Learfield and Sidearm is dismissed for failure to state a claim. Plaintiffs may file an amended complaint within 14 days to plead additional facts supporting their claim.

19

If they do not timely amend, final judgment will enter dismissing the VPPA claim against Learfield and Sidearm with prejudice. Judgment will enter as to UF and the UAA after a final resolution of Plaintiffs' claim against Learfield and Sidearm.

SO ORDERED on October 6, 2023.

*s/ Allen Winsor*
United States District Judge